Morning, Your Honor. Edward Espiglon III for the defendants below with me at counsel at the table is James Coleman, County Counsel for Clackamas County. I'd ask to reserve five minutes for rebuttal if that's possible with the Court's questions. As argued by plaintiff at trial, this is a case of a vast conspiracy involving both named defendants and non-named defendants. The problem is that this was not a conspiracy case. There's no conspiracy instruction to the jury. And there's no evidence to support that each and every individual that was named as a defendant engaged in the conduct that they engaged in, either with a racial motive or with a motive to retaliate. The standard of review in this case is de novo of the legal decision of the trial court. There's two that are being reviewed between our appeal and the cross appeal. The decision of the trial court to grant Chief Deputy Detloff a directed verdict, and the decision of the trial court to deny a directed verdict to Clackamas County and the remaining individual defendants. As for Chief Deputy Detloff, I think you have to start at the top. And the evidence in this case is devoid of any evidence from which a reasonable jury could raise an inference of discriminatory intent or retaliatory intent on his part. Also, I'll point out that in their opening brief, plaintiffs did not argue that the court erred in granting a directed verdict. They simply argued that they should not have reduced the punitive damages attributed to Chief Deputy Detloff. And we take that position at that point. Was there a directed verdict or was there a right to detloff or just a washing out of the punitive damages? It was a directed verdict. We filed a renewed – we moved for a directed verdict to the close of evidence, plaintiff's evidence. Again, it's a close of all evidence. We renewed that motion at the post-trial stage, and it was granted as to Chief Deputy Detloff. If you review the judgment, there is no judgment. There is a judgment entered in favor of Chief Deputy Detloff. As such – That's the best answer, right? Yes. It just says right there, judgment for Chief Deputy Detloff or Defendant Detloff. As for the – as such, there's really not an issue in this appeal as to what his motivation was. His motivations were pure. Now, next we move down to Defendant Grahn, because it works best if you work backwards. Again, there is no evidence in the record from which a reasonable jury – Go back to Detloff for a minute. Isn't there – was there or could there have been a permissible inference by the jury that by the very act of delaying the actual discharge for so long, there was an inference that Detloff was involved, either because he was trying to essentially cover up what happened or because simply by dragging Mr. Bell on for so long, there was something discriminatory about that? I don't think so, Your Honor. As the records show, while it took an extended period of time, there was good reason for that. First – the first recommendation to terminate was in the 12th of June of 1998. Almost immediately thereafter, Plaintiff filed his first complaint of discrimination. At that point, an investigation was conducted, and the evidence suggests that that investigation wasn't completed until, I believe, mid-October was when the letter from Mr. Parks went out advising Mr. Bell of the results of that investigation. In addition, during that period of time – And it took two more months. Well, that's correct, Your Honor, but there is time involved in processing these things. There was a point where – Didn't he say the reason why it took so long was because he didn't want people to think it was discrimination at all? That's exactly correct. He was making sure that there was a thorough investigation – But that could have been done either way in front of a jury, couldn't it? I don't think so, Your Honor. There's absolutely nothing that a reasonable jury could infer discrimination on the part of Chief Deputy Dettlaff. The delay – was it a delay? Was it a reasonable delay? I don't think so. A matter of two months from when the investigation is completed and a final decision, part of that time to allow Mr. Bell to come in and meet with him and discuss the results of the evaluation, part of that time to have the scores evaluated by an outside agency. I think that if he had gone too fast, there might have been a rush to judgment, but I don't think that inference arises from proceeding in a cautious manner. Again, referring to Deputy Grahn, there's just nothing in the record. There's no evidence of any racial comments by Grahn. In his original complaint of discrimination, plaintiffs cited the fact that he was not assigned Grahn as a field training officer as one of the reasons he felt he was discriminated against. The plaintiff was given the opportunity to give his assent to Grahn being his training officer. Grahn was absent the majority of the time that the plaintiff was claiming these other misconduct was being engaged in. So he was an untainted individual who engaged in the process of the training program and who concluded that the plaintiff was not meeting the standards of the field training program. Now, Chief Deputy Detloff, when you review his letter of termination, relies solely on the scores of Deputy Grahn. He cites just the specific daily observation reports from Grahn, and he is also implicitly, because he had seen Larry Park's letter, relying on the fact that an investigation showed that no discrimination took place. These factors combined act to cut off causation as to anything that happened prior to June 17th, 1998. And the termination of plaintiff in December of 1998. There's no causation. But even if there was, you can go back and look at it. Because Chief Deputy Detloff relied not on the recommendations of the individuals in June of 1998. He relied upon the performance of plaintiff in July and August. Detloff's liability now, or we're talking about Grahn's liability? Well, I had discussed Grahn, and then I'm moving on to the point that since both Grahn and Detloff, there's no evidence in the record that would support an inference of discrimination or retaliation, and that is the only basis upon which this termination decision was made, that that cuts off everybody else's liability. Because the only adverse employment action that went to the jury in this case was the termination. None of this would have occurred, however, without the actions of the others. Well, perhaps if the record supported that inference, you might be correct, Your Honor, but the record does not. The record in this case shows the plaintiff was failing this program long before he claimed that anybody made a racist comment to him. Could you show us what that's showing? Your Honor, plaintiff claims that DOR 52 is the turning point. That would be the 18th of May, 1998, when he has the striped-off conversation with Sergeant Alderman. Prior to that, he had any number of failing grades, both by his Phase II FTO, who he testified at trial was not biased against him, and he did not contest any of the scores. Is there anything in the record to demonstrate that that number of failing grades sort of endangered his continuation? Yes, there is, Your Honor, a couple of things. If you look at the scoring guides, they're in the record. First of all, they point out what plaintiff's contention is is that it was when the FTOs, the failures to respond, were given. That is the important point. Those are the natural consequence of repeated failure to meet minimum standards. So the pattern was already in place at that point. What's a failing grade, a three or less? It's not a numerical basis, Your Honor. It's looking at a pattern of performance to determine whether this person has had an adequate opportunity to train. You do all this apparently objective stuff, and then you don't have any objective way to judge. It's not like when you're in school and you get an A or a B or a C. It's looking at the pattern of performance. Was there a significant difference in the scores after that May 27th meeting? Actually, Your Honor, the significant change in scores started with a change to Phase 4 early May. And that's to be expected. And again, this is something that's in the record that cannot be contested by plaintiff in the training manual. When you shift from Phase 3 to Phase 4, that is a significant change in the training program. At that point, you are starting to take responsibility yourself. You're supposed to take sole responsibility for what you're doing, and the training officer is supposed to step back. Have you put in any comparatives to show a precipitous drop like this by anybody else? No, Your Honor, but I think that's one of the reasons plaintiff loses. Plaintiff's burden of proof in this case. They showed a precipitous drop. You're trying to explain it, but you didn't show anything to substantiate your explanation. Well, plaintiff would have to show that those scores were false in order to prevail in this case. In order to show that it was false, plaintiff relies on three things. His own testimony, he claims the testimony of his experts, and his past performance prior to his work with Clackamas County. But none of that is sufficient to show that any of those scores are false. The plaintiff's testimony is used as only a proof. But these are subjective scores, surely. There are a subjective component to them, but there's also objective components. But as plaintiff's expert indicated, you can only score police work on a subjective basis. Well, that may be, but still, it still means that you can't simply look at the scores and say, therefore, you win. Well, I would agree with that, Your Honor, if plaintiff had brought in evidence showing that people outside the protected class were being scored differently. But plaintiff didn't do that. What plaintiff chose to do at trial is rely on his own testimony that these scores were false, and that's not sufficient. In Goodwin, this Court indicated that an employee's subjective opinion on the scores is not sufficient evidence to create an issue of fact for the jury. Now, admittedly, there are a few minor occasions. I guess, well, we ought to start out with this person. We're talking about 1,400 scores. Of those, approximately 200 were adverse to plaintiff, and of those, approximately 20 he contests. Of that 20, when you review the transcript of the record, probably 75% of them, his disagreement is that, well, I didn't earn that score. That score wasn't warranted. That, under Goodwin, is a type of evidence that is not sufficient for the jury. On a few other occasions, he did testify that the facts didn't support that. In their supplemental statement of authorities, plaintiff cites you to the new decision by Radd v. Fairbanks, and in there they discuss the situation and point out that where a party comes forward with evidence that they say, well, that didn't happen, it is enough to create an issue of fact if, along with that evidence, they show evidence that the individual was harboring some sort of racial animus in concluding that those are the facts supporting an action. In this case, plaintiff didn't show that sort of animus, and that standard makes sense because employers have the right to make employment decisions and even to make wrong employment decisions. The only time that they are liable for discrimination is when a plaintiff shows that not only were the reasons wrong, but the reasons were motivated by discrimination or retaliation. But let's get... I'm sitting here thinking about your earlier representation that he, in fact, was sailing before this period, and then when I asked you how do we know that, you said you couldn't really explain how we know that. Oh, I didn't mean to leave that impression, Your Honor. I think plaintiff's counsel will probably show you this diagram in their thing. It's attached to their brief. If you look at those scores, you will see that there is a pattern consistent with the termination decision, and the scores that exist long prior to DOR 52. But I don't see that. If I assume that a 4 is a passing grade, which is what I was assuming, now you're telling me I can't assume that. No, I'm not. 4 is a passing grade. I don't have the numbers in front of me. I cited in the brief, I think by the end of Phase 3, he had something like 60 failing grades primarily concentrated in the areas of concern. The other thing that you should keep in mind is that as a lateral transfer, plaintiff was eligible for an acceleration program if he was meeting standards. That program starts when you change into Phase 3. It's also available when you change into Phase 4. Plaintiff was not selected for acceleration, which indicates to you that even long before these issues of retaliation or discrimination was raised, the employer was thinking that he was not adequately performing. No, they were finding that he wasn't especially well performing. If you look at the record, and I can't think of the site right now, but in the guidelines when they talk about the acceleration program, they say that they will be accelerated, and they're demonstrating a consistent pattern of being able to perform at standard, and plaintiff was not doing that at that point. Also, I'd point out that, as I indicated before, where the problems with the scores start is when he moves into Phase 4. The guidelines indicate that's where problems are to be expected, and the FDA failure to respond to trainings are just the natural evolution. Now, in addition to his own testimony as to the quality of his scores, plaintiff relies upon evidence of, I'm sorry, my clock has a problem with a number on it, evidence of statements, and these statements are not sufficient to be direct evidence. I've cited you in my supplemental citations to a case out of the Eighth Circuit talking about how statements of these nature are only direct evidence of discrimination. If they raise the inference of discrimination directly, for instance, in the State Farm case that both Judge Hugg and Judge Goodwin was in, the statement, dumb Mexican made by a supervisor that failed to hire a Hispanic, directly raised the issue of racial animus. In this case, the statements attributed to Deputy Davis, Deputy Hoover, and Deputy Cadotte do not rise to that level. They are best weak indirect evidence. My understanding of the plaintiff's case at this point is that it's a retaliation case, not a racial discrimination case. The jury found for him on both bases. I know, but they were redundant, and the defense is really running primarily in the retaliation. Well, in that case, Your Honor, I'll leave that area, and I'll just talk about retaliation. The only evidence in the record of retaliation the plaintiff seems to be able to point to is the timing. Now, an important key element to retaliation is knowledge of the protected activity. For defendants Davis, Alderman, Cadotte, and Hoover, that could only be knowledge of the statements that were made to Sergeant Alderman in the May 18th meeting. But the record is devoid of any evidence that these individuals knew of those statements at the time they made the record date. Their basis for their knowledge is a glare allegedly made by Deputy Davis to plaintiff following a meeting of training officers, but that is not sufficient. They could not be responsible for retaliation for anything that happened after they submitted their recommendations in June for termination, because they weren't involved after that. We've already gone over Gron and Devlon, where there is no evidence that they were retaliating, even though in the case of Gron, there is no evidence that he knew of either the discrimination complaint or the May 18th comments. In the case of Devlon, obviously he knew of the discrimination complaint, but he awaited a thorough investigation that found that there was no evidence of discrimination before he acted. So there's nothing to find in inference of retaliation on the part of Devlon. That leaves Machado and Fitzwater. Now, they both relied simply on the scoring of other people. They were – there is no direct evidence that they were aware of the May 18th statements to Sergeant Alderman. Again, it's down to this glare from Deputy Davis. And there's mixed evidence whether they were aware of the complaint of discrimination. They believe they were not. The mixed evidence is good enough. So I think we assume that they were aware of that. But their recommendations –  I noticed that. I was just going to wrap up, Your Honor. But their recommendation to terminate predated that knowledge. So there's no evidence tying anything that any of these individuals did to knowledge of protected activities. Again, Your Honor, my time is up at this time. I would simply conclude that the plaintiff did a very good job of convincing the jury a vast conspiracy existed in this case. It was witnessed by the articles attached to their red brief. The fact is the jury was led astray. There is not sufficient evidence to support this verdict. And the judge erred in allowing it to go to the jury as to the defendants other than Chief Deputy Detloff. And he was correct in failing to allow a judgment to be entered against Chief Deputy Detloff. Finally – and I will stop at that time. Thank you, Your Honor. Thank you very much. Thank you. May it please the Court. Helen D'Souza on behalf of Carl Bell. Carl Bell was fired by Sheriff Detloff because Carl Bell was a threat to the racist organization existing at the Clackamas County Sheriff's Office. Evidence of that racist atmosphere is prevalent in the record. It includes the open display of a Ku Klux Klan poster by one of Bell's training sergeants. And more egregiously, perhaps, an open discussion at roll call in which Carl Bell, the only black sheriff's deputy that had ever been hired by the Clackamas County Sheriff's, was required to listen to a discussion wherein Sergeant Alderman taunted or teased another deputy about his resemblance to a member of Aryan nations and his perfect white appearance and also speculated how that deputy would look with a white hood over his head with eye holes cut out. Sergeant – I'm sorry – Carl Bell told this jury about how that made him feel and how intimidated he felt at that time when he was in this training program. The other racist examples that are in the record and that support this jury's verdict, not only for discrimination but for retaliation, include the fact that Carl complained that his training deputy, Davis, was trying to teach him how to do no probable cause stops based on the race of the driver. And Carl wouldn't cooperate with that, and so he was subsequently downgraded and criticized by Deputy Davis for objecting to that behavior. That is just another example of the racist behavior. In the beginning of phase four of his training program, Carl Bell was also criticized by Deputy Cadat because he talked black. So there is evidence of racism within the department, and he was ultimately terminated when he complained about that conduct. The sort of massive exhibit that I brought with me today is actually a defendant's exhibit, and it purports to represent the daily evaluations that Carl Bell received in his training program. Before we look at that, I think it's important to understand that Carl was a successful law enforcement officer before he came to Clackamas County. In fact, he had 11 years of successful law enforcement, a year and a half of which he spent at the city of Lake Oswego, which has a training program nearly identical to Clackamas County's training program. In fact, there was testimony that Lake Oswego borrowed it from Clackamas County, and Lake Oswego is physically located within Clackamas County. The problem- Are those scores from the other city in the record? They are, Your Honor, yes. In fact, I submitted his daily evaluations as part of the supplemental excerpt of record, and he had passing scores there. In fact, passed all five phases of that training program and moved on to be an independent deputy. Things changed dramatically for Carl Bell on May 18th, though, and on that date he had a meeting with Sergeant Alderman, remember the person who was displaying the Ku Klux Klan poster, and he complained to Sergeant Alderman about his training. He complained that Deputy Davis had been trying to teach him to do illegal, unconstitutional racial profiling stops and that Carl Bell was uncomfortable with that. He knew that that was illegal and knew that that was not appropriate. He objected to that behavior. He also objected in the presence of Deputy Kadat to her criticism of him for talking black. It's undisputed that those events happened on Day 51, and that on the next shift- The next shift that Carl worked was May 22nd, and on that date a meeting was held among all his training officers, and purportedly the testimony was, and I think this is so key to what happened here and so key to why this jury understood this case, is because every time the defendants offered an explanation of their behavior, there was conflicting evidence and contradictory evidence that allowed the jury to infer that the defendants were lying. At that May 22nd meeting, it was allegedly held to discuss Carl Bell's failing scores. The record shows that until that day, he didn't have any failing scores. So here a meeting is convened to discuss this problem, and the problem- Day 52, at the beginning of that day, is when the meeting is held, and the agenda of the meeting is supposedly to discuss- He did have some one scores before that, some two scores before that. He did, but he never got an NRT score, which is their equivalent of a failing score, which says not responding to training. But on that day, for the first time in his 11-year law enforcement career, he got those bad scores. The evidence was that on that day, Deputy Davis came out of that meeting, gave Carl Bell an angry look, and stormed off. And that's evidence from which the jury could infer that one of the topics of conversation at that May 22nd meeting was in fact the complaint that Carl had voiced. We know from Reeves, from Passantino, and from Winarto, that falling performance scores that are close in time to an event or to a complaint are evidence from which a jury can infer retaliation, that they can infer that because he made this complaint, and then all of a sudden he has these bad scores, that there is a relationship between those two events, and that suffices to prove that claim. I think what else is... Is the only evidence that this was discussed at the May 21st meeting that Davis looked angry? Well, the other evidence was that out of that meeting, supposedly to discuss Carl Bell's problems, he was never informed of the subject matter. No meeting memorandum was generated.  Deputy Fitzwater, who was the training coordinator, took notes at that meeting, as she did at many meetings, but those notes have been shredded. And so the jury could infer from that that there wasn't a positive tone to that meeting, or that it wasn't in Carl Bell's interest that that meeting occurred. I think the other... Really some of the best evidence in this record that Carl Bell was performing is the very evaluations of the defendants prior to Day 52. In the record, Deputy Davis finishes training with Carl Bell on May 1st, and he rates Carl very highly on officer safety, on knowledge of criminal laws, on report writing. He writes glowing commentary. Subsequently, without any intervening contact, but after the complaint that Carl made on June 12th, Deputy Davis decides that Carl Bell should be terminated. In fact, he writes a multi-page, single-space memorandum saying that, you know, this person should be terminated. When he actually worked with him, he rated him highly. He gave him good scores. He ended their time together by saying, good job, good luck. I want to also focus on another event just with regard to the chart, is on Day 57, Sergeant Peck writes an evaluation of Carl Bell that's in the record at ER 667, and he says Carl Bell is going to be a real asset to the sheriff's department. The next day, these defendants all get together and say he should be fired. Well, what happened in between? What happened in between is his complaint. He said, there's race discrimination going on in the sheriff's office, and I don't like the criticism of talking black. There's racism, and I object to it. That's what happened. That's what changed the outcome of this case. I'd like to address Sheriff Detloff and the evidence against him. I think the trial court erred in taking away the punitive damages. The jury was very impressed with- Excuse me. Did it also take away the compensatory damages against Detloff? Well, there were no specific compensatory damages allocated to Detloff. The defendants- They were all allocated against the- Generally, right. And the defendants chose to have the verdict form read that way, that culpability of one would be liability against all. It's only the punitive damages that were specified by individual. But the question is, what was granted? Was it a motion to- For judgment as a matter of law. So it was that liability against Detloff in general was gone. Well, but it actually is only addressed to punitive damages because that's the only motion that was made for Detloff. What did Detloff do that justified punitive damages? And I think it's important to address that. Judge Gelderk's relied on the fact that he said Detloff only relied on the recommendations of other people. But you have to look at those recommendations and see how absurd that is. The evidence also shows that Sheriff Detloff testified he never read Carl Bell's discrimination complaint. That's in the transcript, and that was what the jury heard the sheriff, who said it was an important matter to fire Carl Bell. And he knew that he had been the only black deputy in 27 years that Detloff had been in the department. He said it was an important matter, but he never bothered to read the race discrimination complaint. That's in the record. Well, that may be negligence or something, but what is it that carries malicious and the usual epithets that we apply to punitive damage behavior? Well, for one thing, there was expert testimony by Katsaras, who was a nationally recognized police expert who said that presented with this documentation that was so inconsistent with just this chart that shows this dramatic drop-off in scores. What was Detloff's role in that? He should have investigated. He said he reviewed this before he fired Carl Bell. Well, he did trigger an investigation, right? Yes, but he never read the results of the investigation. Well, usually people get punitive damages for doing something intentionally with improper motives, et cetera. Now, if you have a bureaucratic lapse or something or negligence or mismanagement, you don't get punitive damages, you get compensatory damages. Precisely, Your Honor. I think it's important that the evidence was so much more than that. The evidence was that on June 10th, Detloff came to Captain Grobare, the training captain, and said, I want termination memos on Bell. What basis did he have for doing that? He didn't have any. He had never met Carl Bell. And I know the defendant said that he took this extra time. Termination memos might have been to cover his own backside if this thing got out into a public. But I think, Your Honor, that's true. If you take one isolated fact, I think the jury could have said no punitive damages against Detloff. Instead, they noticed that he said, I ordered termination memos on June 10th. And then he was asked in his deposition and at trial, when did you first find out about any training problems with Carl Bell? He said, well, I found out on June 12th. So there's inconsistency in that. He knew, and then he subsequently knew, that Carl Bell filed a race discrimination complaint about the very people who are filling out these evaluations. And what did he do about that? He ordered an investigation, which was complete in October, but he fired Carl Bell, essentially put him on leave in August, or allowed that to happen in August, without ever knowing what that investigation said. He also said, and the defendants have raised this, you know, his reliance on this other evidence as justification for his behavior. But he said he also relied on this oral review. Well, the evidence was Captain Grohl-Behr ordered these so-called independent reviewers to come in and look at the FTEP training program. And on his calendar, he notes, are they heads up? Well, the jury heard that, and the jury could infer from that that these so-called independent reviewers were not all that independent. And in any event, they never generated a report of their review. Are they heads up? In other words, have they been given a heads up as to what's going on? Right, to what they're supposed to find. And why didn't Sheriff Detloff have to read the independent investigation? Did he already know what the outcome was going to be? Did he already know that they were going to find that none of this was, you know, justified, that it was a predetermined outcome? The other important thing, I think, is that the documentation is so inconsistent. Even those reviewers from Marion County looked at Deputy Davis' records and said, you know, this is pretty inconsistent. On the one hand, when he's actually training the guy, he rates him pretty well. He rates him highly, gives him floors, he compliments his officer of safety. So why on June 12th does he write this lengthy termination memo that contradicts that documentation? And the other thing the court should look at and that the jury looked at is the memos by Machado. And those are submitted along with my brief as an appendix. Those memos are totally inconsistent. The signed memos by Machado say, this guy's great, Carl Bell's doing great, continue him in the program. The unsigned memos, and I think there's a reasonable inference from the record, that the memo that says terminate him was actually drafted by Lieutenant Machado. It's not signed by Vera Cruz. Vera Cruz says, as of September 21st, continue this guy in training. He's doing a good job. And, of course, we know, you know, we heard that Grahn is innocent. But Grahn waits until Vera Cruz goes on vacation in July, and then just a couple days into the training program. Vera Cruz's explanation was that he was retroactively filling out something from June and then filing something for September. Right, but he's asked, you know, why are these conflicting termination memos? Why aren't they signed? And he said, I don't know. I don't have an explanation. But the jury heard and saw Captain Grobear's calendar, and Lieutenant Machado's statement in there, I think, puts this in context. Lieutenant Machado said, we're reaching a point where this is going to go harder for us if we don't get this done. And I think a reasonable inference from that was that the, you know, that they were concerned about documenting what was happening. So, you know, I think there are missteps that the defendants made in their effort to fire Carl Bell, gave the jury more than substantial evidence. And I think what's also telling is that before the jury rendered its verdict, it sent a note out to Judge Gelders, and it wanted to know how he was going to protect them from retaliation by these police officers. Essentially, they said, and then they said in the news article, they retaliated once, they could do it again. So they had a real fear, and there's evidence in this record to justify that fear. There's evidence of falsified documentation. There's evidence of inconsistent explanations. And we know from Reeves, Passantino, and Winarto, that this pattern of unusual falling scores that can't be explained are sufficient evidence from which the jury can find that the real reason for Carl Bell's firing was race discrimination and retaliation. Do you want to address the fees issue at all? I don't care to spend time. I do would like to spend a moment, though, talking about the reduction in punitive damages against the individual deputies. I think that was a due process challenge was raised to the amount of the punitive damages being in excess of $52,000. And that number is dramatic. What that represents is one year of Carl Bell's lost wages because he was fired by Lake Oswego, or I'm sorry, by Clackamas County, plus his moving expenses back to Florida. And I think the jury was sending a message to these individual deputies, we won't tolerate this. We won't tolerate retaliation based on complaints of racism and racial profiling. And so we're awarding against each individual this amount. Judge Deldricks reduced that purportedly on a due process challenge based on ability to pay. But in the same paragraph that he made that reduction, he acknowledged that, in fact, the county will pay any award. And I submit that it takes a substantial sum of money to demonstrate to Clackamas County that racism is not appropriate. This jury courageously stood in the face of racism and said, we won't tolerate it. And this court should reinstate that jury's verdict. Thank you very much. Thank you. Is that a three or a two in the beginning? Two. Okay, thank you. Your Honors, I think the jury note, I think the statements in the Oregonian, those are all the indications why this case must be referred. This jury was misled. They were led to believe that there was this vast conspiracy that retaliated against people that has no basis in fact. They weren't led to believe it in any way except by a presentation of evidence, and they chose to believe. An argument of counsel, Your Honor. Right. As counsel did here today, he said no failing scores until after he reported. But you've got the documentation that there are threes and ones and twos well before there's any complaint of any sort of racial misconduct. But no NRTs. No, you're correct, Your Honor, but this circuit is recognized where an employer starts a course of action, just because there's a complaint, they don't have to stop it. The course of action leading to those NRTs started back here on day one or two, Which was the day? This chart does not help us in knowing what numbers correspond to what actual days. So which was May 18th? I believe 52 was May 18th. The DORs are in the record. I thought it was May 22nd was the 51. I know this is, we're playing it through the lines, so it's 51 or 52 is the 18th. It's the 18th or the 21st? The 22nd. If 51 is the 18th and the 52 is the 22nd. I just, I don't have that off the top of my head. It is in the record. Again, they raise this thing about, oh, records are inconsistent because, for instance, Vera Cruz did a two-week evaluation for ending July 19th, but he signed it in September, and then he recommends termination. They're trying to, as they did with the jury, manufacture issues would not exist. With Sheriff Dettlaff, that he asked for a termination recommendation on the 10th when he didn't learn of the recommendations until the 12th. Well, if you read the transcripts of the record, ER 1004, 1005, what he testified to is, I really can't remember the date at the time of trial. I think it was around the date that he was put on administrative leave, June 12th. Then when he's given the information to refresh his memory, he says, no, it was the 10th. At that point, it was stipulated that it was the 10th, so that's a non-issue. Dettlaff, sure, he did not read the actual Loper-Cole report, but he read Mr. Park's letter. It's about a seven-page letter going through all the complaints and why they were unfounded. That's about it, ER 105A. But doesn't it strike you as peculiar that when he was the one that wanted the investigation, they wouldn't read it? No, it doesn't, Your Honor, because at that point, he had consulted with counsel that told him there was nothing to the complaints. He'd reviewed this letter. There was no need for someone at his level to go through the details when he'd been advised by people he trusted that there was no substantial evidence. How long was the report? It was three volumes. It was very long. I can't tell you the number of pages offhand. I did want to briefly talk about punitive damages. I've got about 50 seconds. And attorney fees. First on the attorney fees and reply brief, plaintiff raised an issue about a multiplier. It wasn't raised in their open-ended brief, and that's been waived. The trial court is in the best position to decide the proper hourly rate. The trial court determined that punitive damages were unreasonable in part on the fact that Oregon law establishes a $1,000 penalty for this sort of discrimination. And the jury awarded punitive damages 50 times that amount. And there is a due process concern about that that the Supreme Court has recognized in its punitive damage cases. Okay. Your time is up. Thank you. Thank you very much. The case of Dell v. Clackamas County is submitted.
judges: Goodwin, Hug, Berzon